

DA 06-0507

IN THE SUPREME COURT OF THE STATE OF MONTANA

2008 MT 126

JOHN AND LINDA TIMM,

      Petitioners and Appellants,

  v.

MONTANA DEPARTMENT OF
PUBLIC HEALTH AND HUMAN
SERVICES,

      Respondent and Appellee.

APPEAL FROM:    District Court of the First Judicial District,
In and For the County of Lewis and Clark, Cause No. CDV 2005-289
Honorable Thomas C. Honzel, Presiding Judge

COUNSEL OF RECORD:

      For Appellant:

      Sol Lovas, Sol Lovas, Lawyer, P.C., Billings, Montana

      For Appellee:

      Francis X. Clinch, Special Assistant Attorney General, Helena, Montana

    For Amicus Curiae:

      Nancy P. Gibson, Attorney at Law, Missoula, Montana

      Submitted on Briefs:  June 26, 2007

      Decided:  April 21, 2008

Filed:

_____
Clerk

Justice Patricia O. Cotter delivered the Opinion of the Court.

¶1 Appellants John and Linda Timm (Timms) appeal an order of the First Judicial District, Lewis and Clark County, affirming a decision of the Board of Public Assistance of the State of Montana (Board). We affirm in part, reverse in part, and remand for further proceedings.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 In July of 2002 appellant Linda Timm entered the Roosevelt Memorial Nursing Home in Culbertson, Montana. Linda was forty-seven years old at the time and in an advanced stage of multiple sclerosis. Her husband, appellant John Timm, was a truck driver for J & R Transportation, Inc., a closely-held family transportation business. On November 1, 2002, Linda and John applied for Medicaid assistance with the Roosevelt County Office of Public Assistance (OPA) of the Montana Department of Public Health and Human Services (DPHHS). In this application, the Timms requested Medicaid assistance with Linda's nursing home costs.

¶3 Medicaid is a joint state and federal program created by Congress in 1965 under Title XIX of the Social Security Act, 42 U.S.C. § 1396. Medicaid is administered by "the Secretary of Health and Human Services (HHS), who in turn exercises his authority through the Centers for Medicare and Medicaid Services (CMS)." *Ark. Dept. of Health and Human Servs. v. Ahlborn*, 547 U.S. 268, 275, 126 S. Ct. 1752, 1758 (2006). One of the purposes of Medicaid is to "enabl[e] each State, as far as practicable under the conditions in such State, to furnish . . . medical assistance on behalf of families with dependent children and of aged, blind, or disabled individuals, whose income and

2

resources are insufficient to meet the costs of necessary medical services" and provide funds to the states to furnish medical assistance to those in need. 42 U.S.C. § 1396. States are given "substantial discretion" in determining how federal funds from the Medicaid program are administered. *Pharmaceutical Research and Mfrs. of Am. v. Walsh*, 538 U.S. 644, 665, 123 S. Ct. 1855, 1868-69 (2003). Each participating state has the responsibility for developing "a plan containing reasonable standards for determining eligibility for medical assistance, and an individual becomes eligible for Medicaid if he or she meets the state's criteria." *Hofer v. Mont. Dept. of Pub. Health & Human Servs.*, 2005 MT 302, ¶ 32, 329 Mont. 368, ¶ 32, 124 P.3d 1098, ¶ 32 (citing *Schweiker v. Gray Panthers*, 453 U.S. 34, 36-37, 101 S. Ct. 2633, 2636 (1981)).

¶4 The Medicaid program in Montana is administered by DPHHS in a manner consistent with federal law. Sections 53-6-101 and 111(1), MCA. The "reasonable standards" governing the Montana Medicaid program are contained in the Montana State Medicaid Plan (Montana Medicaid Plan). The Montana Medicaid Plan, like all state Medicaid plans, is subject to review by CMS for compliance with federal Medicaid law. 42 C.F.R. § 430.14 (2007).

¶5 Medicaid benefits are determined in a two-step process. The first step requires a determination whether the Medicaid applicant is eligible to receive Medicaid benefits. "Eligibility for Medicaid is dependent upon a determination of whether an applicant has 'available' resources, and coverage will be denied if an applicant's resources exceed a statutory ceiling." *Hofer*, ¶ 31 (citing *Ramey v. Reinertson*, 268 F.3d 955, 958 (10th Cir. 2001); 42 U.S.C. § 1396a(a)(10)(A)(i)(IV)). If an applicant is Medicaid eligible, then

3

DPHHS determines how much of the Medicaid recipient's post-eligibility income must be paid towards the cost of care, and how much of the remaining difference will be paid for by Medicaid. 42 C.F.R. § 435.725 (2007).

¶6 In a case such as this, where a married couple is seeking Medicaid benefits for an institutionalized spouse, the first step requires the couple to submit a resource assessment application. Admin. R. M. 37.82.1331 (2002). This application lists all the assets held by the married couple as of the first day of the month in which the applicants request assistance for the institutionalized spouse. DPHHS then classifies each accessible asset as either excludable or countable. These classifications are based upon federal Medicaid law. Admin. R. M. 37.82.903 (2002); 42 U.S.C. § 1382b. If an asset is excludable, it will not be counted towards the total financial resources available to the couple. Excludable assets include the following: the home, one car, pre-paid burial plans, term life insurance, and property essential to self-support. Countable assets include those assets not falling into the excludable category. After DPHHS determines which assets are "countable," they are valued. DPHHS then uses this figure to calculate what is known as the community spouse resource maintenance allowance (CSRMA). The CSRMA is equal to one-half of all the countable assets, and represents the amount of available assets that the "community spouse"—i.e., the spouse still living in the community—is permitted to keep under Medicaid eligibility standards. Admin. R. M. 37.82.1336 (2002). The CSRMA has a lower limit of $19,908.00 and an upper limit of

4

$99,540.00.[1]  If the CSRMA is less than lower limit, the community spouse can keep up to the lower limit, and if the CSRMA exceeds the upper limit, then the spouse can keep only up to the upper limit amount.  The institutionalized spouse is given an allowance of up to $2,000.00 in countable assets.

¶7     The CSRMA plus the $2,000.00 allowance for the institutionalized spouse is referred to as the "spend down target"; that is, the amount of countable resources that a married couple may keep while retaining Medicaid eligibility for the institutionalized spouse.  If the couple has countable resources which exceed this figure, then they must "spend down" their countable resources until they reach this target.  Once they have done so, the institutionalized spouse is Medicaid eligible.  Accordingly, an institutionalized spouse is Medicaid eligible when the couple has left only the following financial resources: (1) excludable resources; (2) the institutionalized spouse's $2,000.00 allowance; and (3) the community spouse's CSRMA.  After these eligibility requirements have been satisfied, the couple has ninety days to effectuate the transfers necessary to give the institutionalized spouse the $2,000.00 allowance and put the remaining resources into the community spouse's name.  Admin. R. M. 37.82.1338 (2002).

¶8     After the required transfers have been effectuated and Medicaid eligibility established, DPHHS reviews the income of both spouses to determine how much of the institutionalized spouse's post-eligibility income must go towards health care costs.  The community spouse keeps all of his or her income.  The institutionalized spouse, however, must pay all of his or her post-eligibility income towards health care costs, save for the

[1] These limits are adjusted annually.  Admin. R. M. 37.82.1336(2)(b) (2002).

following: (1) a personal needs allowance; (2) incurred medical expenses and insurance premiums; (3) maintenance needs for the family; and (4) the community spouse income maintenance allowance (CSIMA). The CSIMA is the amount of the institutionalized spouse's income that may go to the community spouse in order to bring the community spouse's income up to a certain specified level, guaranteeing the community spouse a certain level of income. The adjusted figure for the CSIMA, as set by the state of Montana for 2005, was between $1,604.00 and $2,377.50. What remains of the institutionalized spouse's income after these allowances are taken into account goes to the institutionalized spouse's care. The difference between the contribution from the remaining income of the institutionalized spouse and the cost of care is paid for by Medicaid.

¶9 After the Timms submitted their application, OPA began collecting the required financial information to determine whether Linda would be eligible for Medicaid benefits for the costs of her nursing home care. For a variety of reasons not relevant to the current appeal, the process of collecting this information was considerably delayed. The first resource assessment was finally completed by OPA on February 12, 2004. After this assessment was completed, OPA informed the Timms that they were ineligible to receive Medicaid assistance because their financial resources exceeded the allowed limit. The Timms' total countable resources were valued at $57,909.87, and their CSRMA was $28,954.94. Therefore, their "spend down target," the CSRMA plus $2,000.00 allowance for Linda as the institutionalized spouse, was $30,954.94. This meant they had to spend nearly $27,000.00 in order to become Medicaid eligible.

6

¶10    In March of 2004, the Timms re-arranged their finances in order to become Medicaid eligible.  Because DPHHS had a policy of including as "countable" property owned by an applicant held in trust or corporate form, John's one-third ownership interest in J & R Transportation, Inc., worth roughly $20,150.00, had originally been considered countable by OPA.  To circumvent this "no corporation, no trust" rule[2] and reduce the Timms' countable resources, they traded in John's one-third ownership interest in J & R Transportation for a truck which John used in the course of business and titled the truck in his name.  By doing so, they converted John's ownership interest from a countable asset to an excludable one, because the truck was considered property essential to self-support.  See ¶ 6.  Additionally, they paid approximately $5,400.00 in outstanding bills.

¶11    After these expenditures, OPA reassessed the Timms' application and informed them, by letter on May 11, 2004, that Medicaid would cover Linda's nursing home costs as of March 1, 2004.  In this letter, OPA stated that Linda would owe $1,123.40 from her monthly income towards the cost of care and that John would receive a CSIMA of $0.00.  Because Linda had been at Roosevelt Memorial Nursing Home since July of 2002, the Timms were left with an outstanding medical debt of over $35,000.00 for which they were personally responsible.

---

[2] The Montana Medicaid Manual (MA) is the policy manual which DPHHS has adopted and incorporated as governing the administration of the Medicaid program in Montana.  Admin. R. M. 37.82.101(2) (2007).  The MA states this "no corporation, no trust" rule as follows: "Property held in a trust or owned by a corporation is not owned by a filing/assistance unit. Therefore, no personal property exclusions in this section can be applied to trust or corporate property, regardless of whether or not any member of the filing/assistance unit is a trust beneficiary or corporate shareholder."  MA 402-1, p.1 (July 1, 2003).

¶12    After receiving notification of Medicaid eligibility from OPA, the Timms requested a fair hearing to challenge this decision, and a hearing was held before a hearings officer on June 28, 2004.  The Timms challenged OPA's decision in several respects.  First, the Timms asserted OPA should have treated John's interest in J & R Transportation as property essential to self-support, and thus an "excludable" asset.  If OPA had done so, the Timms assert they would have been Medicaid eligible at an earlier date.  The Timms maintained it violated equal protection to classify John's corporate property as a "countable" asset, because the interest was in reality property essential to his self-support since it was an interest in the closely-held transportation company for which he worked.

¶13    The Timms also maintained that when OPA conducted its resource assessment, it should have taken into account the size of the Timms' accumulated nursing home bill and offset that amount against their countable resources.  If OPA had done so, the Timms argue, it would have found them Medicaid eligible at an earlier date.  The Timms point out that if they had actually paid this bill, their countable resources would have been reduced accordingly.  They argued that OPA's refusal to utilize "resource spend down" to offset their nursing home care bill against their available resources, was based on regulatory classifications that violated equal protection and administrative law generally.

¶14    Additionally, the Timms challenged OPA's determinations with respect to the use of Linda's post-eligibility income.  The Timms argued that John should have been given an increase in his CSIMA, instead of the CSIMA of $0.00 he was given, for two reasons.  First, the Timms asserted that exceptional circumstances resulting in financial duress

existed in their case, and urged the hearings officer to exercise his discretion to increase the CSIMA for John under 42 U.S.C. 1396r-5(e)(2)(B).[3] Second, the Timms argued they were entitled to an increase in John's CSIMA so that Linda could use her post-eligibility income to pay for those nursing home care costs she acquired prior to becoming eligible for Medicaid. Instead of dedicating her post-eligibility income solely to pay for future expenses, the Timms argued it should first be used to allow John to pay for nursing home care expenses already incurred.

¶15  On January 10, 2005, the hearings officer rejected the Timms' appeal, and affirmed the decision of OPA on January 24, 2005. The hearings officer declined to address the Timms' equal protection claims as beyond his jurisdiction. However, the hearings officer did determine that OPA's decision not to offset the Timms' accumulated nursing home debt against their countable resources was correct under administrative law. The hearings officer found that there were no regulations or policy permitting such an offset and that "[t]here is no legal authority which allows the consideration of unpaid debt when determining Medicaid eligibility and this tribunal cannot fashion such a remedy."

¶16  The hearings officer also denied the Timms' request for an increase in John's CSIMA. The hearings officer found there were no exceptional circumstances indicating financial duress, and so declined to exercise his discretion under 42 U.S.C. § 1396r-5(e)(2)(B) to grant an increase in John's CSIMA. Additionally, the hearings

---

[3] Under this statute, the CSIMA may be increased upon a showing of "exceptional circumstances resulting in significant financial duress . . . ." 42 U.S.C. § 1396r-5(e)(2)(B).

officer concluded that the Montana Medicaid Plan prevented the Timms from using Linda's post-eligibility income to pay for nursing home care costs incurred prior to her eligibility for Medicaid. The hearings officer noted that the Montana Medicaid Plan allows post-eligibility income to go towards pre-eligibility incurred costs if the services provided were: (1) prescribed by a physician; (2) not a Medicaid covered service; and (3) not payable to a third party. In this case, the nursing home care costs were a Medicaid covered service, and therefore post-eligibility income could not be used to pay those costs. The relevant portion of the Montana Medicaid Plan reads in full as follows:

**REASONABLE LIMITS ON AMOUNTS FOR NECESSARY MEDICAL OR REMEDIAL CARE NOT COVERED UNDER MEDICAID**

For institutionalized individuals, an amount of medical expenses incurred while in the institution may be disregarded from monthly income if it is:

1. Prescribed by a physician;
2. Not a Medicaid covered service; and
3. Not payable by a third party.

¶17 The hearings officer determined that the phrase "not a Medicaid covered service" in the Montana Medicaid Plan referred to a service for which Medicaid would not provide coverage. If Medicaid provided coverage for the service, then post-eligibility income could not be used to pay for the service. The fact that Medicaid did not actually pay for Linda's nursing home care before she was eligible for Medicaid did not mean that it was "not a Medicaid covered service" within the meaning of the Montana Medicaid Plan. As stated by the hearings officer, "the Timms have misinterpreted the term, 'not a Medicaid covered service', to mean *not covered since the person was not eligible for*

10

*Medicaid*." Here, because Medicaid would have paid for Linda's nursing home care costs had she been eligible, she could not use her post-eligibility income to pay for those services.

¶18 The decision of the hearings officer was affirmed by the Board on April 5, 2005. The Timms then appealed this decision to the First Judicial District, Lewis and Clark County, under the Montana Administrative Procedure Act (MAPA), Title 2, Chapter 4, MCA. The District Court in turn affirmed the Board's April 5, 2005 affirmance of the hearings officer's decision of January 24, 2005. First, the District Court rejected the Timms' argument that the decision to include John's ownership interest in J & R Transportation as a "countable" resource constituted a violation of equal protection of the laws. The District Court observed that under *State v. Debus*, 2002 MT 307, 313 Mont. 57, 59 P.3d 1154, Montana law recognizes shareholders have an equitable interest in corporate property, but not legal ownership. The District Court concluded that until John traded his interest in J & R Transportation for the truck, he did not own any property which would qualify as property essential to his employment as a truck driver. This, combined with the fact that no state Medicaid regulations permitted ownership of corporate stock to be considered an "excludable" asset, led the District Court to conclude that OPA's decision, and its subsequent affirmance by the hearings officer and the Board, were correct. As such, the District Court rejected the Timms' argument that "DPHHS is violating equal protection because it treats people differently based on their business entity status," concluding that equal protection did not apply in the instant case.

11

¶19 Similarly, the District Court rejected the Timms' assertions that OPA's decision violated the equal protection of the laws by not allowing them to offset their unpaid nursing home bills against their countable resources when initially determining their Medicaid eligibility. The District Court found that the Timms failed to demonstrate that the hearings officer erred in concluding there was no legal authority which would have allowed OPA to take into consideration the Timms' unpaid medical bills when determining Medicaid eligibility. See ¶ 15. Further, the District Court found no merit to the Timms' argument that failure to permit such a consideration violated equal protection, because "the record shows that DPHHS followed federal law which does not allow a deduction for 'incurred medical expenses' in the resource determination. Since there is no regulation which allows for such a deduction, the Court concludes that equal protection does not apply."

¶20 The District Court also rejected the Timms' argument that they should be allowed to use Linda's post-eligibility income to pay for nursing home costs incurred prior to her Medicaid eligibility. Affirming the interpretation of the hearings officer, the District Court concluded that under the terms of the Montana Medicaid Plan, see ¶ 16, the Timms could not use post-eligibility income to pay for Linda's pre-eligibility nursing home care costs because such costs arose from a Medicaid covered service, and thus do not meet all three requirements. As the District Court concluded, "[i]t is the type of service, not the timing or classification of the service, that is to be considered for post-eligibility income exclusion." The District Court, concluding that this limitation on the use of post-eligibility income was a "reasonable limitation" on the determination of Medicaid

12

benefits, thus affirmed the decision of the hearings officer and the Board respecting the Timms' use of Linda's post-eligibility income.

¶21 The Timms have timely appealed the District Court's decision to this Court.

**ISSUES**

¶22 We restate the issues on appeal as follows:

¶23 **Issue One**: Did the District Court err in upholding the Board and hearings officer's affirmance of OPA's decision to treat John's ownership interest in J & R Transportation as a countable asset?

¶24 **Issue Two**: Did the District Court err in upholding the Board and hearings officer's affirmance of OPA's decision to deny Linda the ability to use her post-eligibility income to pay for nursing home care expenses incurred prior to her Medicaid eligibility?

¶25 **Issue Three**: Did the District Court err in upholding the Board and hearings officer's affirmance of OPA's decision not to offset the Timms' countable resources by the amount of their accumulated nursing home care expenses?

¶26 **Issue Four:** Did the hearings officer abuse his discretion by not granting an increase in John's CSIMA pursuant to his authority under 42 U.S.C. § 1396r-5(e)(2)(B)?

**STANDARD OF REVIEW**

¶27 Actions by the Board and the hearings officer are reviewed under the standards set forth in MAPA. *Kirchner v. State*, 2005 MT 202, ¶ 9, 328 Mont. 203, ¶ 9, 119 P.3d 82, ¶ 9. These actions will be reversed if they prejudice the substantial rights of the appellants based on findings, inferences, conclusions, or decisions that are affected by an

error in the law, or are clearly erroneous, or, further, if the Board or hearings officer failed to make findings of fact essential to their decisions. Section 2-4-704(2), MCA. Findings of fact are clearly erroneous when they are not supported by substantial credible evidence, the court has misapprehended the effect of the evidence, or a review of the record leaves this Court with the conviction that a mistake has been committed. *State v. Wheeler*, 2006 MT 38, ¶ 12, 331 Mont. 179, ¶ 12, 134 P.3d 38, ¶ 12. Moreover, we review any conclusions of law made by an administrative agency to determine if they are correct. *Kirchner*, ¶ 10. We apply these same standards to our review of the district court's review of an agency's administrative decision. *O'Neill v. Dept. of Revenue*, 2002 MT 130, ¶ 10, 310 Mont. 148, ¶ 10, 49 P.3d 43, ¶ 10.

## DISCUSSION

¶28 **Issue One:** *Did the District Court err in upholding the Board and hearings officer's affirmance of OPA's decision to treat John's ownership interest in J & R Transportation as a countable asset?*

¶29 The District Court concluded that John's ownership interest in J & R Transportation was correctly included in the resource assessment application as a "countable" resource. The Timms maintain this was error. On the one hand, the Timms assert that DPHHS's "no corporation, no trust" policy (See ¶ 10 n. 2), which led to the inclusion of John's interest in J & R Transportation as a countable resource, violates equal protection of the laws under Article II, Section 4 of the Montana Constitution. Further, the Timms assert that the "no corporation, no trust" rule is fatally flawed from an administrative law perspective because it is purely a creation of DPHHS, found nowhere in either the federal Medicaid statutes or regulations, and leads to absurd results which

14

are inconsistent and "not reasonably necessary to effectuate the purpose of" the federal Medicaid program. Lastly, the Timms argue that the "no corporation, no trust" rule, which was adopted in July of 2003, was applied retroactively to their application in violation of the prohibition against ex post facto and retroactive laws under Article II, § 31 and Article XIII, § 1(3) of the Montana Constitution, and in violation of § 2-4-306, MCA, which provides that administrative rules are effective only after their publication. We will consider each of these arguments in turn.

## A. Equal Protection Claims

¶30    "The principal purpose of the Equal Protection Clause, Article II, Section 4, of the Montana Constitution, is to ensure that persons who are citizens are not subject to arbitrary and discriminatory state action." *Davis v. Union Pacific Ry. Co.*, 282 Mont. 233, 240, 937 P.2d 27, 31 (1997). "[A] party claiming violation of the right to equal protection must first demonstrate that the law at issue discriminates by impermissibly classifying individuals and treating them differently based on that classification. Once the classification has been identified and it has been established that members of the different classes are similarly situated, we determine the appropriate level of scrutiny to apply." *State v. Ellis*, 2007 MT 210, ¶ 20, 339 Mont. 14, ¶ 20, 167 P.3d 896, ¶ 20. We apply strict scrutiny to laws which affect "fundamental rights, intermediate scrutiny for laws conferred by the Montana Constitution but not found in the Declaration of Rights, or rational basis if neither strict scrutiny nor intermediate scrutiny applies." *Ellis*, ¶ 11.

¶31    In the situation at bar the Timms were able to change John's ownership interest in J & R Transportation from countable to excludable by liquidating his interest and buying

15

a truck used in the business. The Timms argue that under *Davis* no rational basis exists for discriminating between whether an asset is countable or excludable based solely on the form in which it is owned. The Timms maintain that neither the goal of controlling costs of Montana's Medicaid program, nor any other proffered reason, provides a rational basis for this discrimination. Accordingly, the Timms argue the DPHHS "no corporation, no trust" rule is unconstitutional and that the District Court erred in affirming OPA's decision to consider John's ownership interest in J & R Transportation as a countable asset.

¶32 On appeal, DPHHS apparently does not dispute that the "no corporation, no trust" rule treats those who own property in a corporate or trust form differently from those who own property in other forms, but instead counters the Timms' position by arguing that a rational basis exists for this distinction. DPHHS maintains that the "no corporation, no trust" rule is consistent with the policy supporting the exclusion for property essential to self-support, because only if the Medicaid applicant actually owns the property, and its use is essential to self-support, may he or she exclude it from his or her countable assets. DPHHS points out that the purpose of permitting an exclusion for property essential for self-support is to ensure that a community spouse be able to keep the assets through which he or she is making a living. Because owners of corporate property do not legally own such property, the harm sought to be minimized by excluding property essential for self-support from the resource assessment—namely, that the applicants would be forced to sell such property in order to be Medicaid eligible—does not exist when the property is owned in corporate form. Thus, there is a rational

16

basis for not allowing owners of corporate property to exclude that property from their resource assessment when determining whether they are Medicaid eligible, while allowing such an exclusion for property essential to self-support. DPHHS maintains that John's ownership interest was not identifiable with any particular property to which he had a claim of legal ownership and that "[u]ntil he purchased the truck, John Timm didn't have any legal ownership of anything that was 'essential' to his means of making a living as a trucker."

¶33 Lastly, DPHHS contends that, contrary to the Timms' assertions, under *Hofer* cost control would provide a rational basis for the different treatment of the two classes, because "[i]t is the nature of Medicaid that the states develop policies ensuring that the limited federal funds are available to the most impoverished people."

¶34 Because DPHHS does not challenge the existence of a class subject to equal protection in this case, we assume for the sake of analysis that the "no corporation, no trust" rule implicates the equal protection of the laws under Article II, § 4 of the Montana Constitution. Accordingly, we assume the rule does treat two similarly situated classes of individuals differently based on their classification; i.e., Medicaid applicants seeking an exclusion for property owned in a corporate or trust form, and Medicaid applicants seeking an exclusion for property owned in a form other than a corporation or trust (e.g., held personally, in a sole proprietorship, or in a partnership). We will a apply rational basis review to the Timms' equal protection claims in this case because there is no fundamental right to receive Medicaid benefits in Montana, nor does any other provision

of the Montana Constitution confer such a right. *Ellis*, ¶ 11. We have summarized this rational basis review as follows:

> Using the rational basis test, this Court must determine if there is a legitimate governmental objective which bears some identifiable rational relationship to the discriminatory classification.
>
> A classification that is patently arbitrary and bears no rational relationship to a legitimate governmental interest offends equal protection of the laws. As we have previously held, equal protection of the laws requires that all persons be treated alike under like circumstances.

*Davis*, 282 Mont. at 242-43, 937 P.2d at 32 (citation and quotation omitted).

¶35 The question here is whether there is an "identifiable rational relationship" between classifying property held in a trust or corporate form as "countable," while treating the same property held in another form as "excludable" if it meets one of exclusions as defined by DPHHS. See ¶ 6. The Timms argue that no such rational relationship exists. We agree. The governmental interest in allowing property essential to self-support to be excluded from the resource assessment is so that Medicaid applicants can keep the assets which they use to make a living. The District Court, citing to *Debus*, ¶ 32, observed that shareholders do not possess legal ownership in corporate property, and thus there is a rational basis for denying an exclusion to owners of corporate property because they do not have legal ownership of that property. The District Court further observed that the potential of the applicants being compelled to sell corporate property is non-existent since the corporation, and not the individual, actually owns it. As such, the District Court concluded that the legitimate governmental objective of allowing people to keep property necessary for self-support bears an identifiable

18

rational relationship to the practice of treating Medicaid applicants who actually own property essential to self-support differently from those whose interest in property is only equitable due to the fact that such property is held in a corporate form.

¶36 While this case has been on appeal the Timms have submitted supplemental authority which calls this rationale into question. In particular, they point to MA 402-1, p. 20 (January 1, 2008), which apparently permits an exclusion for property essential for self-support that is owned by a limited liability company (LLC).

> In order for property to be excluded as necessary for <u>self-employment</u>, the owner must be materially participating in the self-employment business at least 10 hours per week throughout the year, must claim the endeavor is self-employment, and, if filing income taxes, must be reporting the income on Schedule C, F or SE, the property is treated as property/equipment necessary for self-employment business. [*sic*] Otherwise, the property is treated as income producing property.

MA 402-1, p. 20 (January 1, 2008).

¶37 As the Timms correctly note in their Second Notice of Supplemental Authority, filed on January 3, 2008, the income from an LLC can end up on a Schedule C. Admin. R. M. 42.23.702(1) (2007). This means that property held in LLC form could be excluded as property necessary for self-support.

¶38 LLCs, just like corporations, can hold property. Section 35-8-107(5), MCA. Thus, if DPHHS was truly basing the "no corporation, no trust" rule on the fact that property is held in corporate form, and not personally, then it makes no practical or legal sense to allow an exclusion for property held by an LLC as it, and not a particular individual, actually owns the property—exactly as did the corporation in the Timms' case.

19

¶39 Thus, the premise which DPHHS argues provides a rational basis for the "no corporation, no trust" rule cannot withstand scrutiny. Because DPHHS does not dispute that the rule treats two similarly situated classes of individuals differently, it must provide some rational basis for the disparate treatment. Although DPHHS argues that cost control provides such a basis, this argument does not pass muster because it fails to explain why the goal of cost control is served by allowing LLCs an exclusion for property in some situations, while denying outright any exclusions for property held in a corporate or trust form.

¶40 As we observed in *Hofer*, "[i]n structuring the Medicaid program, Congress chose to direct the limited funds available to the most impoverished people." *Hofer*, ¶ 31. As a result, Medicaid eligibility turns upon an applicant's " 'available' resources, and coverage will be denied if an applicant's resources exceed a statutory ceiling." *Hofer*, ¶ 31. Because the funds available under Medicaid are limited, the administration of Medicaid is at its essence based on controlling costs. Thus, the State may adopt rules aimed at allowing exclusions for some property, and denying such exclusions for others. *Hofer*, ¶ 31 (noting that Congress has passed legislation specifically aimed at "restrict[ing] the ability of applicants to use trusts to shelter assets and gain Medicaid eligibility."). However, this authority does not excuse DPHHS from the obligation to provide a rational basis for these distinctions when its classifications are challenged on equal protection grounds. Here, it has simply failed to do so. Thus, we hold that the "no corporation, no trust" rule as applied to the Timms in this case violated their rights to equal protection.

¶41 Accordingly, we remand this issue to the District Court for further proceedings. Because we find the "no corporation, no trust" rule violates equal protection as applied to the Timms, we do not reach the other challenges they raise with respect to this rule.

¶42 **Issue Two:** *Did the District Court err in upholding the Board and hearings officer's affirmance of OPA's decision to deny Linda the ability to use her post-eligibility income to pay for nursing home care expenses incurred prior to her Medicaid eligibility?*

¶43 The District Court concluded that the Board correctly affirmed the hearings officer's decision preventing Linda from using her post-eligibility income to pay for nursing home care costs incurred prior to her Medicaid eligibility. The District Court noted that the Montana Medicaid Plan allows post-eligibility income to go towards pre-eligibility incurred expenses only if the services are: (1) prescribed by a physician; (2) not a Medicaid covered service; and (3) not payable by a third party. See ¶ 16. In this case, the District Court concluded that requirement number two was not satisfied because Linda's nursing home care costs are a service for which Medicaid provides coverage. While Linda did not specifically have her pre-eligibility costs covered, this did not change the fact that the nursing home costs themselves were a type of service for which Medicaid provided coverage. As stated by the District Court, "[i]t is the type of service, not the timing or classification of the service, that is to be considered for post-eligibility income exclusion." Thus, the District Court concluded that such a limitation on the use of post-eligibility income was "a reasonable limitation for the program" and thus lawful under Medicaid. *See Hofer*, ¶ 32 (noting that state Medicaid plans are to "contain[] reasonable standards for determining eligibility for medical assistance.").

21

¶44    On appeal, the Timms and amicus curiae National Academy of Elder Law Attorneys, Inc. (Academy) charge that the District Court erred in this conclusion. Timms and the Academy assert that the phrase "not a Medicaid service" contained in the Montana Medicaid Plan means simply that the service itself, for whatever reason, was not actually paid for by Medicaid. They argue that it is not relevant why Medicaid did not pay for the service, so long as it was not actually covered, even if it was a service for which Medicaid would provide coverage had the applicant been eligible.

¶45    Timms and the Academy claim that their position is supported by interpretations of federal Medicaid statutes and regulations as construed by CMS. See ¶ 3. One of these interpretations is contained in a letter issued by CMS on September 13, 2004, wherein CMS discussed the ability of states to place "reasonable limits" on the use of post-eligibility income pursuant to 42 C.F.R. § 435.725 (2007). The second is a final decision issued by the CMS administrator (CMS Decision) dated March 28, 2007.[4] In the CMS Decision, the administrator specifically addressed whether the Maryland State Medicaid Plan could "limit the deduction of medical expenses in the post-eligibility process to only those expenses incurred during a period of eligibility for Medicaid." The administrator, reviewing the legislative history in this area and the federal Medicaid statutes themselves, held that such a prohibition was contrary to congressional intent as expressed in 42 U.S.C. § 1902(r)(1) of the Medicaid program. As stated by the administrator,

---

[4] The CMS Decision is in the record before the Court and "is the final decision of the Secretary and constitutes 'final agency action' within the meaning of 5 U.S.C. 704 and a 'final determination' within the meaning of section 1116(a)(3) of the [Social Security] Act and [42 C.F.R.] § 430.38." 42 C.F.R. § 430.102(c) (2007).

> [W]hen Congress reinstated the rule requiring that States deduct necessary medical or remedial care recognized under State law "but not covered under the State's Medicaid plan", the Secretary reasonably concluded that Congress reinstated the Secretary's policy with respect to post-eligibility treatment of costs for services incurred during a period of ineligibility. The Secretary's policy reasonably treats expenses for medical or remedial care incurred in the period prior to eligibility as "not covered under the State plan. . . ." The Maryland [State Medicaid Plan] which allows [a] deduction in the post-eligibility program process only if an individual is eligible for Medicaid during the period is inconsistent with the CMS policy.

¶46   The Timms argue that the CMS Decision supports their "position that Linda Timm must be permitted to use her post-eligibility income to pay for the costs of her pre-eligibility nursing home care . . . ." We agree. The Secretary of HHS has "broad authority to promulgate regulations defining eligibility requirements for Medicaid." *Schweiker*, 453 U.S. at 43, 101 S. Ct. at 2640. Standards proscribed by the Secretary for administering the Medicaid program are "entitled to legislative effect . . . ." *Schweiker*, 453 U.S. at 44, 101 S. Ct. at 2640. The role of the courts in reviewing the Secretary's interpretation of statutory terms in the Medicaid program is limited to "ensuring that the Secretary did not excee[d] his statutory authority and that the regulation is not arbitrary and capricious." *Schweiker*, 453 U.S. at 44, 101 S. Ct. at 2640 (quotation omitted, alteration in original).

¶47   CMS has determined that services incurred prior to Medicaid eligibility are considered to be "not covered under the State plan" under federal Medicaid law. The phrase "not a Medicaid covered service" in the Montana Medicaid Plan must be consistent with the CMS Decision because DPHHS is bound to follow this interpretation in the Montana Medicaid Plan. "The department of public health and human services

23

shall adopt appropriate rules necessary for the administration of the Montana medicaid program as provided for in this part and that *may be required by federal laws and regulations governing state participation in medicaid* under Title XIX of the Social Security Act, 42 U.S.C. 1396, et seq., as amended." Section 53-6-113(1), MCA. (Emphasis added). Under the CMS Decision, costs incurred for services prior to Medicaid eligibility must be considered "not a Medicaid covered service" so long as they were not actually covered by Medicaid. The phrase "not a Medicaid covered service" as used in the Montana Medicaid Plan must be consistent with this interpretation. See ¶ 3.

¶48 Accordingly, we conclude the District Court erred in upholding the Board and hearings officer's affirmance of OPA's decision. Under the CMS Decision, Linda may use her post-eligibility income to pay for costs incurred at the Roosevelt Memorial Nursing Home prior to the date of her Medicaid eligibility. Accordingly, we remand this issue back to the District Court for further proceedings.

¶49 **Issue Three:** *Did the District Court err in upholding the Board and hearings officer's affirmance of OPA's decision not to offset the Timms' countable resources by the amount of their accumulated nursing home care expenses?*

¶50 The Timms also maintain that the District Court erred in affirming the decision of the Board and the hearings officer denying them the ability to offset their accumulated nursing home care costs against their countable resources. The Timms assert that had they been permitted this offset, they would have been eligible for Medicaid as early as March of 2003, because their countable resources would have been lowered by the amount of the nursing home care costs already incurred. The Timms assert that failure to allow this offset has no rational basis and therefore violates equal protection,

24

administrative law, and is inconsistent with other jurisdictions which have held that resource spend downs are required in their state Medicaid programs.

¶51 We disagree. In the first instance, as noted by both the hearings officer and the District Court, the Timms have provided no legal authority for their position. As the District Court concluded:

> Here, the record shows that DPHHS followed federal law which does not allow a deduction for "incurred medical expenses" in the resource determination. Since there is no regulation which allows for such a deduction, the Court concludes that equal protection does not apply.

¶52 On appeal, the Timms have provided no additional authority to show that the District Court's conclusion is incorrect, and no authority showing that federal law requires states to utilize resource spend down in administering Medicaid. In fact, the Timms' argument here relies solely on *Deaconess Med. Ctr. v. Dept. of Soc. and Rehab. Servs.*, 222 Mont. 127, 720 P.2d 1165 (1986). *Deaconess*, however, was not a Medicaid case, but concerned itself solely with the application of middle-tier scrutiny to the constitutionality of statutory income limitations for assistance to the medically needy under the pre-1988 version of Article XII, § 3(3) of the Montana Constitution. This case has little applicability in the present context, where federal law is determinative. See ¶ 4.

¶53 Accordingly, we conclude the Timms' equal protection and administrative law arguments are without merit and therefore affirm the District Court.

¶54 **Issue Four:** *Did the hearings officer abuse his discretion by not granting an increase in John's CSIMA pursuant to his authority under 42 U.S.C. § 1396r-5(e)(2)(B)?*

¶55 Lastly, we turn to the Timms' argument that the hearings officer abused his discretion by failing to grant John an increase in his CSIMA pursuant to his authority under 42 U.S.C. § 1396r-5(e)(2)(B). Because John's CSIMA may be increased pursuant to our holding under Issue Two, we decline to address this argument.

**CONCLUSION**

¶56 We reverse the District Court's conclusion that OPA's inclusion of John's interest in J & R Transportation as a "countable" resource did not violate the equal protection of the laws. We also reverse the District Court's conclusion that Linda may not use her post-eligibility income to pay for the nursing home care costs she incurred prior to her Medicaid eligibility. We therefore remand these issues to the District Court for further proceedings consistent with this Opinion.

¶57 However, we affirm the District Court's conclusion that OPA's failure to utilize resource spend down in this case did not violate equal protection of the laws and, further, that this decision was consistent with administrative law. Lastly, for the reasons set forth above, we decline to further address the Timms' argument as to whether the hearings officer should have increased John's CSIMA pursuant to his discretion under 42 U.S.C. § 1396r-5(e)(2)(B).

/S/ PATRICIA COTTER

We concur:

/S/ KARLA M. GRAY

26

/S/ JAMES C. NELSON
/S/ W. WILLIAM LEAPHART
/S/ JOHN WARNER
/S/ JIM RICE
/S/ BRIAN MORRIS


Justice Jim Rice specially concurring.

¶58 I concur with the Court's holding on all issues and write only to note that, under the equal protection issue, Issue One of the Opinion, the rational basis test is the most lenient and easiest test under which the state can justify its classifications. Indeed, we have explained that "in applying this 'rational basis' test, '[A] discrimination will not be set aside if any state of facts reasonably may be conceived to justify it.'" *See Johnson v. Sullivan*, 174 Mont. 491, 498, 571 P.2d 798, 802 (1977) (quoting *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S. Ct. 1101, 1105 (1961)); *see also Kottel v. State*, 2002 MT 278, ¶ 55, 312 Mont. 387, ¶ 55, 60 P.3d 403, ¶ 55 ("a classification is reasonable if any reasonably conceivable state of facts provides a rational basis for it"). However, I can conceive of no set of facts which would justify the Department's exclusion of self-employment property held by a LLC but not self-employment property held by Timms' small family-owned corporation, which classes appear to be similarly situated. Nor was my effort to justify this distinction aided by the Department, who did not respond to Timms' argument in this regard.

/S/ JIM RICE