FILED

12/11/2024

Bowen Greenwood
CLERK OF THE SUPREME COURT
STATE OF MONTANA

Case Number: DA 23-0572



DA 23-0572

IN THE SUPREME COURT OF THE STATE OF MONTANA

2024 MT 303

PHOEBE CROSS, a minor by and through
his guardians Molly Cross and Paul Cross;
MOLLY CROSS, an individual; PAUL CROSS,
an individual; JANE DOE, an individual;
JOHN DOE, an individual; JUANITA HODAX,
on behalf of herself and her patients,
KATHERINE MISTRETTA, on behalf of
herself and her patients,

        Plaintiffs and Appellees,

    v.

STATE OF MONTANA; GREGORY GIANFORTE,
in his official capacity as Governor of the
State of Montana; AUSTIN KNUDSEN,
in his official capacity as Attorney General;
MONTANA BOARD OF MEDICAL
EXAMINERS; MONTANA BOARD OF
NURSING; MONTANA DEPARTMENT OF
PUBLIC HEALTH AND HUMAN SERVICES;
CHARLIE BRERETON, in his official capacity
as Director of the Montana Department of
Public Health and Human Services,

        Defendants and Appellants.

APPEAL FROM:   District Court of the Fourth Judicial District,
                 In and For the County of Missoula, Cause No. DV 23-541
                 Honorable Jason Marks, Presiding Judge

COUNSEL OF RECORD:

       For Appellants:

             Austin Knudsen, Montana Attorney General, Michael D. Russell,
             Michael Noonan, Thane Johnson, Alwyn Lansing, Assistant
             Attorneys General, Helena, Montana

Emily Jones, Special Assistant Attorney General, Jones Law Firm, PLLC, Billings, Montana

For Appellees:

Alex Rate, Marthe Y. VanSickle, Akilah Deernose, ACLU of Montana, Missoula, Montana

Malita Picasso, ACLU Foundation, New York, New York

Matthew P. Gordon, Heather Shook, Courtney Schirr, Sara Cloon, Kayla Lindgren, Perkins Coie LLP, Seattle, Washington

Peter C. Renn, Kell Olson, Lambda Legal Defense and Education Fund, Los Angeles, California

Elizabeth O. Gill, ACLU Foundation, San Francisco, California

Nora Huppert, Lambda Legal Defense and Education Fund, Chicago, Illinois

For Amicus Curiae Montana Family Foundation:

Derek J. Oestreicher, Montana Family Foundation, Laurel, Montana

For Amicus Curiae Compassion & Choices:

Peter Michael Meloy, Meloy Law Firm, Helena, Montana

For Amici Curiae Elliot Page and Fifty-Six Other Individuals:

Colin Gerstner, Gerstner Adam Law, PLLC, Billings, Montana

Carmine D. Boccuzzi, Jr, Cleary Gottlieb Steen & Hamilton, LLP, New York, New York

Sydney Duncan, Transgender Legal Defense & Education Fund, Inc. New York, New York

For Amici Curiae Biomedical Ethics and Public Health Scholars:

Michelle T. Weinberg, Michelle T. Weinberg, PLLC, Missoula, Montana

Katelyn Kang, Valeria M. Pelet del Toro, Cooley LLP, New York, New York

For Amici Curiae American Academy of Pediatrics and Additional National and State Medical and Mental Health Organizations:

Jon Moyers, Moyers Kohn Law, Billings, Montana

D. Jean Veta, William R. Isasi, Covington & Burling, LLP, Washington, District of Columbia

For Amici Curiae GLBTQ Legal Advocates & Defenders and National Center for Lesbian Rights:

Rob Farris-Olsen, Morrison, Sherwood, Wilson & Deola, PLLP, Helena, Montana

Jordan D. Hershman, Morgan, Lewis & Bockius, LLP, Boston, Massachusetts

Submitted on Briefs: July 17, 2024

Decided: December 11, 2024

Filed:

_____
Clerk

3

Justice Beth Baker delivered the Opinion of the Court.

¶1 The State of Montana appeals the District Court's grant of a preliminary injunction temporarily enjoining the 2023 Legislature's Senate Bill 99 ("SB 99"), which proscribes the use of medications and surgery to treat gender dysphoria in minors. We consider two issues:

> 1. *Do Plaintiffs have standing to challenge SB 99?*
>
> 2. *Did the District Court manifestly abuse its discretion or commit an error of law in granting preliminary injunctive relief?*

We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

¶2 The Montana State Legislature passed SB 99 during the 2023 Legislative Session. S. 99, 68th Leg., Reg. Sess. (Mont. 2023), codified in §§ 50-4-1001 to 1006, 37-2-307, 53-6-135, MCA. The bill's stated purpose is "to enhance the protection of minors and their families . . . from any form of pressure to receive harmful, experimental puberty blockers and cross-sex hormones and to undergo irreversible, life-altering surgical procedures prior to attaining the age of majority." Section 50-4-1002, MCA. SB 99 proscribes the use of certain treatments and surgical procedures for "a female minor to address the minor's perception that her gender or sex is not female." Section 50-4-1004(1)(a), MCA. The surgical procedures that SB 99 prohibits for "female minors" include, but are not limited to, "a vaginectomy, hysterectomy, oophorectomy, [and] ovariectomy." Section 50-4-1004(1)(a)(i), MCA. SB 99 also prohibits administering to "female minors" "supraphysiologic doses of testosterone or other androgens," and "puberty blockers such

4

as GnRH agonists or other synthetic drugs." Section 50-4-1004(1)(a)(ii)-(iii), MCA. Likewise, SB 99 prohibits different treatments and surgical procedures for "a male minor to address the minor's perception that his gender or sex is not male." Section 50-4-1004(1)(b), MCA. For "male minor[s]," SB 99 prohibits surgical procedures including but not limited to, "a penectomy, orchiectomy, vaginoplasty [and] clitoroplasty." Section 50-4-1004(1)(b)(i), MCA. SB 99 prohibits "supraphysiologic doses of estrogen" and "puberty blockers such as GnRH agonists" that "delay or suppress pubertal development in male minors." Section 50-4-1004(1)(b)(ii)-(iii), MCA. SB 99 exempts these treatments and surgeries from its prohibitions, however, if not knowingly used to "address a female minor's perception that her gender or sex is not female," and similarly exempts them if not knowingly used to address "a male minor's perception that his gender or sex is not male." Section 50-4-1004(1)(c), MCA.

¶3 SB 99 further imposes professional consequences on a health care professional who knowingly violates its provisions. It declares that a physician or health care professional who provides a prohibited procedure or treatment has "engaged in unprofessional conduct and is subject to discipline." Section 50-4-1004(2)(a), MCA. The law directs "the appropriate licensing entity or disciplinary review board" to suspend the person's "ability to administer health care or practice medicine for at least 1 year." Section 50-4-1004(2)(a), MCA. It also grants the "parents or guardians of the minor subject to the violation . . . a private cause of action for damages and equitable relief." Section 50-4-1004(2)(b), MCA. A health care professional or physician's professional liability insurance may not include

5

coverage for damages assessed against the person for providing a prohibited procedure or treatment. Section 50-4-1006, MCA.

¶4 SB 99 contains additional prohibitions. Among them, public funds may not be directly or indirectly used to provide the prohibited procedures or treatments; an individual or entity who pays for a prohibited procedure or treatment may not deduct the amount paid from their state taxes; Montana Medicaid and children's health insurance programs may not reimburse or provide coverage for prohibited procedures or treatments; and State properties may "not be knowingly used to promote or advocate the use of social transitioning" or the prohibited procedures or treatments. Section 50-4-1004(3), (5), (6), (7), MCA. The attorney general may bring actions to enforce compliance. Section 50-4-1004(11), MCA.

¶5 The District Court drew its terminology from the parties' expert declarations and reports. At birth, infants generally are assigned a sex, as the District Court wrote, "based on their external genitalia, internal reproductive organs, and chromosomal makeup." "Sex" is a "distinct biological classification," which "makes us male or female." "Gender" is the "social and cultural concept" denoting "the roles, behaviors, and identities that society assigns to girls and boys, women and men, and gender-diverse people." "Gender identity refers to a person's subjective feelings about their core sense of belonging to a particular gender." A person is "cisgender" if their gender identity matches their sex assigned at birth. "Transgender" describes a person whose gender identity is incongruent with their sex assigned at birth. "Gender dysphoria" designates the diagnosable condition, which can

6

lead to clinically significant distress, arising from the incongruity between a person's sex and gender identity.

¶6 Plaintiff Phoebe Cross is a transgender minor who currently receives treatment banned by SB 99. Plaintiffs also include Molly and Paul Cross, Phoebe Cross's parents, as well as John and Jane Doe, parents of non-party Joanne Doe, a transgender minor currently receiving treatment banned by SB 99. The remaining Plaintiffs, Dr. Juanita Hodax, a pediatric endocrinologist, and Dr. Katherine Mistretta, a Board-Certified Family Nurse Practitioner, Advanced Practice Registered Nurse, and Doctor of Nursing (hereinafter "Provider Plaintiffs"), provide treatments that SB 99 bans.[1] Defendants include, among others, the State of Montana; Gregory Gianforte, in his official capacity as Governor of the State of Montana; and Austin Knudsen, in his official capacity as Attorney General for the State of Montana.

¶7 Plaintiffs filed this action in May 2023 seeking declaratory and injunctive relief. Plaintiffs alleged that SB 99 violated numerous Montana constitutional rights, including their rights to privacy and equal protection. Plaintiffs moved for a preliminary injunction pursuant to § 27-19-201, MCA. In support of their motion, Plaintiffs submitted declarations and an expert report indicating that the treatments proscribed by SB 99 are safe, effective, and often medically necessary for minors with gender dysphoria. They presented written expert testimony supporting their argument that untreated gender

---

[1] Additional Plaintiffs Scarlett Van Garderen and her parents were voluntarily dismissed from the case during appeal after Scarlett turned 18.

dysphoria can lead to significant lifelong distress, clinically significant anxiety and depression, self-harming behaviors, and an increased risk of suicidality.

¶8      Plaintiffs presented additional evidence that the World Professional Association for Transgender Health's ("WPATH") Standards of Care Version 8 are the accepted and appropriate standard of care for the assessment, diagnosis, and treatment of gender dysphoria. Broadly, these treatments are called "gender-affirming care," a term we will use throughout this Opinion. One of Plaintiffs' experts reported that the use of puberty-delaying medication and gender-affirming hormone therapy are two methods that the WPATH standard of care recommends for treating gender dysphoria. Surgery, Plaintiffs' expert reported, is rarely recommended for minors with gender dysphoria under the WPATH standard of care.

¶9      Through an expert report and declarations, the State submitted evidence supporting its arguments that the international medical community has retreated from WPATH standard of care treatments; that there is not medical consensus around using puberty blockers and cross-sex hormones to treat gender dysphoria in minors; and that gender-affirming care harms minors.

¶10     The District Court held that Plaintiffs were entitled to a preliminary injunction under § 27-19-201(1), MCA, because they met Montana's four-part, conjunctive preliminary injunction test.

## STANDARDS OF REVIEW

¶11     We review justiciability issues, such as standing and ripeness, de novo. *Weems v. State*, 2019 MT 98, ¶ 7, 395 Mont. 350, 440 P.3d 4 (*Weems I*) (citation omitted). "This

8

Court reviews a district court's grant or denial of a preliminary injunction for a manifest abuse of discretion." *Montanans Against Irres. Dens. v. State*, 2024 MT 200, ¶ 8, 418 Mont. 78, 555 P.3d 759 (*MAID*) (citing *Driscoll v. Stapleton*, 2020 MT 247, ¶ 12, 401 Mont. 405, 473 P.3d 386). A trial court abuses its discretion by acting "arbitrarily, without employment of conscientious judgment, or exceed[ing] the bounds of reason resulting in substantial injustice." *Planned Parenthood of Mont. v. State*, 2022 MT 157, ¶ 5, 409 Mont. 378, 515 P.3d 301 (citation and quotation marks omitted). An abuse of discretion is "'manifest' when it is 'obvious, evident, or unmistakable.'" *Planned Parenthood*, 2022 MT 157, ¶ 5 (quoting *Driscoll*, ¶ 12).

¶12 We review a district court's interpretation of the law de novo when its decision on a preliminary injunction was based on legal conclusions. *Planned Parenthood*, 2022 MT 157, ¶ 5 (citing *Driscoll*, ¶ 12). "In considering whether to issue a preliminary injunction, neither the District Court nor this Court will determine the underlying merits of the case giving rise to the preliminary injunction, as such an inquiry is reserved for a trial on the merits." *BAM Ventures, LLC v. Schifferman*, 2019 MT 67, ¶ 7, 395 Mont. 160, 437 P.3d 142 (citation omitted). In reviewing a district court's grant or denial of a preliminary injunction, we do not "reweigh conflicting evidence or substitute [our] judgment regarding the strength of the evidence for that of the district court." *Planned Parenthood*, 2022 MT 157, ¶ 41 (citation and quotation marks omitted).

**DISCUSSION**

¶13 *1. Do Plaintiffs have standing to challenge SB 99?*

¶14 "The judicial power of Montana's courts, like the federal courts, is limited to 'justiciable controversies.'" *Plan Helena, Inc. v. Helena Reg'l Airport Auth. Bd.*, 2010 MT 26, ¶ 6, 355 Mont. 142, 226 P.3d 142 (citation omitted). Standing is a justiciability doctrine that is "employed to refuse to determine the merits of a legal claim, on the ground that even though the claim may be correct the litigant advancing it is not properly situated to be entitled to its judicial determination." 13A Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, *Federal Practice and Procedure* § 3531, 1-2 (3d ed. 2008). "[S]tanding is a threshold, jurisdictional requirement in every case," *Heffernan v. Missoula City Council*, 2011 MT 91, ¶ 29, 360 Mont. 307, 255 P.3d 80 (citation omitted), which a court must evaluate at every stage of the litigation. *Barrett v. State*, 2024 MT 86, ¶ 18, 416 Mont. 226, 547 P.3d 630 (citing *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561, 112 S. Ct. 2130, 2137 (1992)).

¶15 The State asserts that Plaintiffs lack standing because they "neither pled nor demonstrated any injury fairly traceable to most of SB 99's provisions." It follows, the State argues, that the District Court lacked jurisdiction to enjoin the entirety of SB 99. Plaintiffs respond that the named parties established their standing to bring these claims and that the State "cite[s] no binding authority to support [its] assertion that a plaintiff raising a facial challenge to the constitutionality of a statute must plead injury-in-fact for every conceivable application of the challenged statute."

¶16 The State asserts that Provider Plaintiffs lack both first- and third-party standing to challenge SB 99. The State does not dispute, however, that at least one plaintiff, Youth Plaintiff Phoebe Cross, has standing under SB 99 § 4(1). "In a multi-plaintiff case such as here, the standing of any one plaintiff is sufficient for a claim to proceed and, upon finding that one plaintiff has standing, 'the standing of the other parties [does] not merit further inquiry.'" *Barrett*, ¶ 19 (quoting *Aspen Trails Ranch, LLC v. Simmons*, 2010 MT 79, ¶ 45, 356 Mont. 41, 230 P.3d 808). This standing principle—that only one plaintiff must have standing for a claim to proceed—is also well-established in federal law.[2] *See Biden v. Nebraska*, 600 U.S. 477, 489, 143 S. Ct. 2355, 2365 (2023) (citation omitted) ("If at least one plaintiff has standing, the suit may proceed."). Additionally, Providers' standing derives, at minimum, from the threatened loss of their ability to practice medicine or face other penalties. This is a concrete injury that entitles them to pursue their claims. *See Dodds v. Tierney*, 2024 MT 48, ¶¶ 24-26, 415 Mont. 384, 544 P.3d 857 (rejecting argument that doctor lacked standing despite allegations of harm to his reputation, license, and employability); *Mishler v. Nev. State Bd. of Med. Exam'rs*, 896 F.2d 408, 410-11 (9th Cir. 1990) (professional license is a protected property right for purposes of due process) (citing *Schware v. Bd. of Bar Exam'rs*, 353 U.S. 232, 238-39, 77 S. Ct. 752, 755-56 (1957)). Our precedent also is settled that healthcare providers have standing to challenge statutes as violative of their patients' rights to privacy under the Montana

---

[2] Though not binding, federal law is "persuasive authority for interpreting the [Montana Constitution's] justiciability requirements [in] Article VII, Section 4(1)." *Plan Helena*, ¶ 6 (citation omitted).

Constitution. *Armstrong v. State*, 1999 MT 261, ¶ 13, 296 Mont. 361, 989 P.2d 364; *Weems I*, ¶¶ 1, 12 (citing *Armstrong*, ¶ 13); *see also Wiser v. State*, 2006 MT 20, ¶¶ 10-12, 14-20, 331 Mont. 28, 129 P.2d 133 (considering denturists' claim that administrative rule violated their patients' constitutional privacy rights).

¶17    The State cites no legal authority in support of its argument that the Plaintiffs had to show injury from each subsection of the statute to acquire standing to challenge it. "We are not obligated to develop arguments on behalf of parties to an appeal, nor are we to develop legal analysis that may lend support to a party's position." *Beck v. Dimar*, 2024 MT 176, ¶ 29, 417 Mont. 444, 554 P.3d 130 (citation omitted). The State has not demonstrated an error of law in the District Court's ruling that the Plaintiffs had standing to bring their claims.

¶18    *2. Did the District Court manifestly abuse its discretion or commit an error of law in granting preliminary injunctive relief?*

¶19    "A preliminary injunction is an extraordinary remedy never awarded as of right." *MAID*, ¶ 10 (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24, 129 S. Ct. 365, 376 (2008)). In 2023, the Montana Legislature amended Montana's preliminary injunction standard, adopting the federal four-factor standard as enunciated in *Winter*, 555 U.S. at 20, 129 S. Ct. at 374. 2023 Mont. Laws ch. 43, § 1. An applicant must establish the following four factors to obtain a preliminary injunction:

    (a) the applicant is likely to succeed on the merits;
    (b) the applicant is likely to suffer irreparable harm in the absence of preliminary relief;
    (c) the balance of equities tips in the applicant's favor; and
    (d) the order is in the public interest

12

Section 27-19-201(1), MCA. Attaching the new Montana standard to federal law, the statute expresses the intent of the Legislature "that the language in subsection (1) mirror the federal preliminary injunction standard, and that interpretation and application of subsection (1) closely follow United States [S]upreme [C]ourt case law." Section 27-19-201(4), MCA. Deviating from Montana's prior standard, "[t]he current test is conjunctive. That is, the applicant for an injunction bears the burden of establishing the likelihood of each element: success on the merits; irreparable harm; balance of the equities; and public interest." *MAID*, ¶ 12.

¶20 Subject to certain exceptions not applicable here, the record we consider on appeal of a preliminary injunction is "the original papers and exhibits filed in the district court, the transcript of proceedings, if any, and a certified copy of the docket entries prepared by the clerk of the district court." M. R. App. P. 8(1). *See also Porretti v. Dzurenda*, 11 F.4th 1037, 1047 (9th Cir. 2021) (citation and emphasis omitted) (noting that review of factual findings on a preliminary injunction appeal is limited to the "record available to the district court when it granted or denied the injunction motion"); *Wilson v. Williams*, 961 F.3d 829, 833 (6th Cir. 2020) (citation omitted); ("Our task is . . . to review the record that was before the district court at the time the preliminary injunction was entered.") *N.M. Dep't of Game & Fish v. U.S. Dep't of Interior*, 854 F.3d 1236, 1254 n.23 (10th Cir. 2017) (refusing to consider "extra-record material" the department submitted for first time on appeal of preliminary injunction).

13

**Likelihood of Success on the Merits**

¶21    In analyzing the first factor of the preliminary injunction test, the District Court concluded that the Plaintiffs had demonstrated a likelihood of success on the merits of both their Montana constitutional equal protection and right to privacy claims.  For the right to privacy claim, the District Court applied our holding in *Armstrong*

> [E]xcept in the face of a medically[] acknowledged, *bona fide* health risk, clearly and convincingly demonstrated, the legislature has no interest, much less a compelling one, to justify its interference with an individual's fundamental privacy right to obtain a particular lawful medical procedure from a health care provider that has been determined by the medical community to be competent to provide that service and who has been licensed to do so.

*Armstrong*, ¶ 62.  The District Court examined the parties' disagreement whether the treatments prohibited by SB 99 constituted a bona fide health risk.  Considering the parties' conflicting evidence, the court held that the State did not clearly and convincingly demonstrate that the proscribed treatments present a bona fide health risk to minors.  It found that "the medical community overwhelmingly agrees that the treatments proscribed by SB 99 are the accepted standard of care for treating gender dysphoria in minors."  The District Court reasoned that Plaintiffs' evidence, which demonstrated that surgical procedures are rarely recommended for minors with gender dysphoria, undercut the State's argument that SB 99 sought to minimize harm by banning gender-affirming surgical procedures.  The District Court noted that it did not need to conclusively resolve disputed facts at the preliminary injunction stage, writing, "trial is the appropriate stage for ultimate fact finding on the science presented in this matter."  The District Court concluded that

14

Plaintiffs had demonstrated a likelihood of success on the merits of their right to privacy claim.

¶22 Montana's right to privacy is contained in Article II, Section 10, of the Montana Constitution, which guarantees that "[t]he right of individual privacy is essential to the well-being of a free society and shall not be infringed without the showing of a compelling state interest." The right to privacy is fundamental; its protection "exceed[s] even that provided by the federal constitution." *Armstrong*, ¶¶ 34-35 (citations omitted). That the right to privacy is separately protected in the Montana Constitution "reflects Montanans' historical abhorrence and distrust of excessive governmental interference in their personal lives." *Gryczan v. State*, 283 Mont. 433, 455, 942 P.2d 112, 125 (1997); *accord Weems v. State*, 2023 MT 82, ¶ 35, 412 Mont. 132, 529 P.3d 798 (*Weems II*) (noting a delegate's comment that the "right to be let alone" is "the most important right of them all" (quoting Montana Constitutional Convention, Verbatim Transcript, March 7, 1972, Vol. V, p. 1681)). "Montana's constitutional right to privacy 'broadly guarantees each individual the right to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from governmental interference.'" *Planned Parenthood*, 2022 MT 157, ¶ 20 (quoting *Armstrong*, ¶ 14). We apply strict scrutiny when a fundamental right, such as the right to privacy, is affected. *Stand Up Mont. v. Missoula Cnty. Pub. Sch.*, 2022 MT 153, ¶ 10, 409 Mont. 330, 514 P.3d 1062 (citation omitted); *Armstrong*, ¶ 34 (citation omitted); *Weems II*, ¶ 43. The strict scrutiny standard requires that the State demonstrate the challenged law is narrowly tailored to serve a compelling government interest and only that interest. *Stand Up Mont.*, ¶ 10.

15

¶23 The State contends that the District Court erred in finding that Plaintiffs demonstrated a likelihood of success on the merits because "[t]he right to privacy is bounded by the State's police power." Drawing from *Wiser v. State*, the State argues that the fundamental right to privacy "is necessarily subordinate to reasonable restraint and regulation by the state in the exercise of its sovereign prerogative—police power." *Wiser*, ¶ 24 (citation omitted).

¶24 The State insists that the District Court's application of *Armstrong* was in error because the challenged statute there prohibited a constitutionally protected medical procedure. Here, the State continues, the safety and efficacy of gender-affirming care are questionable, and therefore the medical care proscribed by SB 99 is not constitutionally protected. The State also maintains that *Montana Cannabis Industry Association v. State*—in which we held that the right to privacy does not guarantee an individual's access to a particular drug—should provide the standard for Plaintiffs' asserted privacy right. *Mont. Cannabis Indus. Ass'n v. State*, 2012 MT 201, ¶ 24, 366 Mont. 224, 286 P.3d 1161 (*MCIA*).

¶25 Plaintiffs respond that the District Court's application of the *Armstrong* standard was not in error. They point to this Court's decisions repeatedly affirming that the Montana Constitution guarantees "the right of each individual to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from the interference of the government." *Armstrong*, ¶ 39; *accord Weems II*, ¶¶ 35-50 (citation omitted); *Planned Parenthood*, 2022 MT 157, ¶ 20 (citation omitted); *Planned Parenthood of Mont. v. State*, 2024 MT 228, ¶ 23, 418 Mont. 253, 557 P.3d 440 (citation omitted); *Planned Parenthood of Mont. v. State*, 2024 MT 178, ¶ 22, 417 Mont. 457, 554

16

P.3d 153. Without clearly and convincingly establishing that gender-affirming care poses a "medically[] acknowledged *bona fide* health risk," which Plaintiffs maintain the State did not do, the State's police power does not allow it to infringe on an individual's fundamental right to privacy. *Armstrong*, ¶ 59; *see also Planned Parenthood*, 2022 MT 157, ¶ 20 (quoting *Armstrong*, ¶¶ 34, 62); *Weems II*, ¶ 47.

¶26 Plaintiffs argue that *Wiser* and *MCIA* are distinguishable from the expansive right to privacy we defined in *Armstrong*. They maintain that *Wiser* is inapposite because the denturists there were not licensed by the State to provide the medical care in question. In contrast, Provider Plaintiffs are licensed by the State to provide the medical care they use to treat gender dysphoria in minors, the same care they use to treat minors with medical conditions that are not subject to SB 99's prohibitions. *See Wiser*, ¶¶ 14-20; § 50-4-1004(1)(c), MCA. Plaintiffs distinguish *MCIA*, maintaining that our holding there concerned a singular drug, medical marijuana, that federal law criminally prohibited for all purposes. *MCIA*, ¶ 32. Here, Plaintiffs argue, gender-affirming care is not criminally prohibited, nor does SB 99 categorically ban the use of gender-affirming medications and procedures; rather, SB 99 bans this form of care for only one purpose. *See* § 50-4-1004(1)(c), MCA.

¶27 Plaintiffs contend that the District Court did not abuse its discretion when it determined that the State did not clearly and convincingly demonstrate that gender-affirming care poses a bona fide health risk to minors. In reaching its conclusion, they maintain, the District Court "conducted a thorough review of the extensive evidence filed by both parties and reasonably exercised its discretion" to find that Plaintiffs'

17

evidence sufficiently demonstrated "that the medical community overwhelmingly agrees that the treatments proscribed by SB 99 are the accepted standard of care for treating gender dysphoria in minors."

¶28 In *Armstrong*, we held that the Legislature generally has no interest in restricting "an individual's fundamental privacy right to obtain a particular lawful medical procedure from a health care provider that has been determined by the medical community to be competent to provide that service and who has been licensed to do so." *Armstrong*, ¶ 62; *accord Wiser*, ¶ 15 (citation omitted); *Weems I*, ¶ 19 (citation omitted); *Stand Up Mont.*, ¶ 14 (citing *Armstrong* for the principle that "a private medical decision involving an individual and healthcare provider . . . [is] constitutionally protected from infringement by the state without a compelling state interest"). That privacy right empowers an individual "to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider free from the interference of the government." *Armstrong*, ¶ 39. Plaintiffs are correct that we have repeatedly reaffirmed Montana's broad personal autonomy privacy right as recognized in *Gryczan* and *Armstrong*. *See Weems II*, ¶ 36 (citation omitted); *Planned Parenthood*, 2022 MT 157, ¶ 20; *Planned Parenthood*, 2024 MT 228, ¶ 23 (citation omitted); *Planned Parenthood*, 2024 MT 178, ¶ 22. The Legislature may restrict this fundamental right to privacy only when it can demonstrate a medically acknowledged, bona fide health risk. *Armstrong*, ¶ 62. In those instances, the law must be tailored narrowly so that it is "the least onerous path that can be taken to achieve the state objective." *Weems II*, ¶ 44 (quoting *Wadsworth v. State*, 275 Mont. 287, 302, 911 P.2d 1165, 1174 (1996)).

18

¶29    *Wiser* and *MCIA* are two narrow exceptions to the *Armstrong* standard. In *Wiser*, a group of denturists challenged a State Board of Dentistry rule that required denturists to refer partial denture patients to dentists before providing partial dentures. *Wiser*, ¶¶ 8-11. The denturists argued that the rule infringed upon patients' state constitutional right of privacy to seek care from the medical professional of their choice. *Wiser*, ¶ 14. We clarified that "*Armstrong* did not hold that there is a right to see a health care provider who is not licensed to provide the services desired." *Wiser*, ¶ 16. Because the denturists were not licensed to provide the services in question, we rejected their privacy claim. *Wiser*, ¶¶ 16, 20.

¶30    In *MCIA*, plaintiffs challenged a state law that restricted their access to medical marijuana. *MCIA*, ¶¶ 2-3. Plaintiffs there maintained that our analysis in *Armstrong* applied because the law infringed their right to privacy. *MCIA*, ¶ 28. We held that, unlike *Armstrong*, plaintiffs' "alleged affirmative right to access a particular drug ha[d] not been constitutionally protected under the right to privacy," and that therefore plaintiffs' claim did not fall under our analysis in *Armstrong*. *MCIA*, ¶ 28. In denying plaintiffs' claim, we relied heavily on marijuana's illegality under the Controlled Substances Act, which undermined their claim that the fundamental right to privacy guaranteed their access to medical marijuana. *MCIA*, ¶ 32.

¶31    Both *MCIA* and *Wiser* are distinguishable from this case. In contrast to the denturists in *Wiser*, the State licensed Provider Plaintiffs to provide the care proscribed by SB 99. *Wiser*, ¶ 16. Compared to *MCIA*, in which the law at issue restricted a single drug for all uses, SB 99 prohibits a host of procedures and medications, but only if used to treat

19

gender dysphoria.  *See* § 50-4-1004(1), MCA, *MCIA*, ¶¶ 2-3.  Further, the procedures and medications proscribed by SB 99 are not "unequivocally illegal," as was medical marijuana when we decided *MCIA*.  *MCIA*, ¶ 32.

¶32     The exceptions to Montana's expansive right to privacy that we recognized in *MCIA* and *Wiser* do not apply here.  Like *Armstrong*, SB 99 proscribes lawful medications and procedures administered by competent and licensed health care providers.  *See Armstrong*, ¶ 62.  The Legislature did not make gender-affirming care unlawful.  Nor did it make the treatments unlawful for all minors.  Instead, it restricted a broad swath of medical treatments only when sought for a particular purpose.  The record indicates that Provider Plaintiffs, or other medical professionals providing gender-affirming care, are recognized as competent in the medical community to provide that care.  *See Armstrong*, ¶ 62.  Like in *Armstrong*, the law puts governmental regulation in the mix of an individual's fundamental right "to make medical judgments affecting her or his bodily integrity and health in partnership with a chosen health care provider."  *Armstrong*, ¶ 39.  The District Court therefore did not err in applying the *Armstrong* standard.

¶33     To succeed on its request for preliminary relief in a constitutional challenge, an applicant must "'establish a prima facie case of a violation of its rights under' the constitution."  *Weems I*, ¶ 18 (quoting *City of Billings v. Cty. Water Dist. of Billings Heights*, 281 Mont. 219, 227, 935 P.2d 246, 251 (1997)).  The federal standard is similar:

> The courts use a bewildering variety of formulations of the need for showing some likelihood of success—the most common being that plaintiff must demonstrate a reasonable probability of success.  But the verbal differences do not seem to reflect substantive disagreement.  All courts agree that

20

plaintiff must present a prima facie case but need not show a certainty of winning.

Wright & Miller, § 2948.3. "Prima facie means literally at first sight or on first appearance but subject to further evidence or information." *Weems I*, ¶ 18 (quoting *Prima facie*, *Black's Law Dictionary* (10th ed. 2014)) (internal quotation marks omitted).

¶34 The issuance of a preliminary injunction does not, as the State argues, necessarily conflict with the principle that a statute is presumed constitutional. A preliminary injunction is "not equivalent to a 'holding' that the statute is unconstitutional," and therefore the presumption of a statute's constitutionality "does not alter the movant's burden to present a prima facie case at the preliminary injunction stage." *Planned Parenthood*, 2022 MT 157, ¶ 33. As with any preliminary injunction, Plaintiffs' burden here is to present a prima facie case that SB 99 violates their constitutional rights.

¶35 The record shows that the District Court did not manifestly abuse its discretion when it concluded that Plaintiffs presented a prima facie likelihood of success on their right to privacy claim. For example, the District Court conscientiously weighed the State's evidence in support of its argument that SB 99 sought to protect minors from harmful, experimental treatments. On this argument, the District Court examined the State's evidence that the U.S. Food and Drug Administration ("FDA") has not approved puberty blockers for use in treating gender dysphoria. The District Court also considered the State's evidence that the international community has retreated from gender-affirming care. In response, Plaintiffs submitted evidence indicating that the treatments proscribed by SB 99 are well-studied and that once the FDA approves a drug generally, the agency permits

21

health care providers to prescribe the drug for off-label use, which occurs frequently for many drugs. Plaintiffs also presented evidence showing that leading United States medical organizations, including the American Medical Association, the American Psychological Association, and the American Academy of Pediatrics, endorse and cite the WPATH standard of care as authoritative for treating gender dysphoria. The WPATH standard of care, Plaintiffs asserted, specifically recommends treatments for gender dysphoria in minors, such as puberty blockers, which SB 99 proscribed.

¶36 On the basis of the parties' evidentiary submissions, the District Court concluded that Plaintiffs had shown a prima facie case that the treatments proscribed by SB 99 are not harmful or experimental, and under *Armstrong*, do not present a medically acknowledged, bona fide health risk to minors. *Armstrong*, ¶ 62. The District Court found that because the State did not demonstrate on the preliminary injunction record that the treatments proscribed by SB 99 presented this risk, the State did not have a compelling interest and thus could not meet strict scrutiny.

¶37 The statute's impact on individual privacy rights triggers strict scrutiny review, which requires the State to demonstrate that "the legislation [is] justified by a compelling state interest and [is] narrowly tailored to effectuate only that compelling interest." *Armstrong*, ¶ 34 (citing *Gryczan*, 283 Mont. at 449, 942 P.3d at 122). Though the State has a compelling interest in "safeguarding the physical and psychological wellbeing of a minor," a statute implicating their privacy rights must be narrowly tailored to serve that interest. *Planned Parenthood*, 2024 MT 178, ¶ 36 (citation omitted). SB 99 affords no room for decision-making by a patient in consultation with their doctors and parents. The

statute is a complete ban, prohibiting individualized care tailored to the needs of each patient based on the exercise of professional medical judgment and informed consent.

¶38 At this stage of the proceedings, the District Court conscientiously weighed the parties' evidence and made no error of law when it applied the *Armstrong* standard to the evidence. Our role is not to reweigh conflicting evidence or to question a district court's assessment of the strength of the evidence on a preliminary injunction appeal. *Planned Parenthood*, 2022 MT 157, ¶ 41 (citation omitted). The District Court properly reserved final resolution of the parties' conflicting evidence for trial on the merits, writing that "[t]he Court's ruling here will not affect the ultimate fact-finding decision on this issue at trial."

¶39 Finally, the court's decision not to parse out particular provisions of the statute from the injunction was within its discretion in light of the preliminary nature of the relief. The Dissent would reverse the decision to enjoin the Medicaid restriction, applying rational-basis review. Dissent, ¶ 70. But we recently held that strict scrutiny applies to a statute disqualifying or restricting "otherwise eligible recipients . . . from certain public healthcare benefits based on their exercise of their fundamental right to privacy as guaranteed under the Montana Constitution." *Planned Parenthood*, 2024 MT 228, ¶ 23. Given its preliminary determination that the Plaintiffs were likely to prevail on their claimed privacy infringement, the District Court correctly applied strict scrutiny to the entire measure. We see no "obvious, evident, or unmistakable" abuse of discretion in the District Court's conclusion on the first preliminary injunction factor. *Planned Parenthood*, 2022 MT 157, ¶ 5 (quoting *Driscoll*, ¶ 12).

23

¶40    The State maintains, however, that the District Court could not have weighed and drawn conclusions from the conflicting evidence without holding a hearing at which the parties' experts could testify and subject themselves to cross-examination. The State cites federal circuit cases, which generally expound the importance of building an adequate factual basis for a trial court to rule on a preliminary injunction. *E.g. U.S. v. Gila Valley Irr. Dist.*, 31 F.3d 1428, 1442 (9th Cir. 1994) (citation omitted) ("On a motion for a preliminary injunction an adequate presentation of the facts is necessary."). For additional support, the State relies on *Doe v. University of Cincinnati* for the simple assertion that "cross-examination has always been considered a most effective way to ascertain truth." *Doe v. Univ. of Cincinnati*, 872 F.3d 393, 401 (6th Cir. 2017) (citation omitted). The State also points the Court to the Ninth Circuit's statement in *Gila Valley* that "[o]n a motion for a preliminary injunction . . . [t]he opposing party must be afforded the opportunity to cross-examine the moving party's witnesses and to present evidence." *Gila Valley Irr. Dist.*, 31 F.3d at 1442.

¶41    In response, Plaintiffs insist that the decision to permit oral testimony at a preliminary injunction hearing was within the District Court's discretion. Plaintiffs analogize to *Planned Parenthood*, where we affirmed the trial court's issuance of a preliminary injunction although the parties were not allowed the opportunity to present live testimony or cross-examine witnesses. *Planned Parenthood*, 2022 MT 157, ¶¶ 39-41, 53-54, 60. At the preliminary injunction hearing, Plaintiffs argue, the State conceded that it had a full opportunity to be heard despite the District Court's refusal to hear oral testimony.

24

¶42 The District Court correctly stated at the scheduling conference, "[W]e don't have a trial before the trial with a preliminary injunction, even under the federal standard." As we held in *Planned Parenthood*, a district court is not obligated to hear live testimony at the preliminary injunction stage of proceedings simply because the parties present conflicting testimony; rather, resolution of conflicting testimony "must be reserved for trial on the merits." *Planned Parenthood*, 2022 MT 157, ¶ 41.

¶43 The federal circuit courts do not uniformly require live testimony at a preliminary injunction hearing. *See Valentine v. Collier*, 956 F.3d 797, 801 n.1 (5th Cir. 2020) (finding it "unclear . . . why [it] matters" that a party did not present live testimony at preliminary injunction hearing, noting that "[i]t has long been true that parties can present evidence at the preliminary-injunction stage with declarations or affidavits"); *Transcon. Gas Pipe Line Co., LLC v. 6.04 Acres*, 910 F.3d 1130, 1169 (11th Cir. 2018) (internal quotation marks and citation omitted)) ("An evidentiary hearing is required for entry of a preliminary injunction only where facts are bitterly contested and credibility determinations must be made to decide whether injunctive relief should issue." . In the Ninth Circuit it is not an abuse of discretion for a federal district court to refuse to hear oral testimony at a preliminary injunction hearing as long as "the parties have a full opportunity to submit written testimony and to argue the matter." *Stanley v. Univ. of S. Cal.*, 13 F.3d 1313, 1326 (9th Cir. 1994) (citations omitted).

¶44 The State's Ninth Circuit authority, *Gila Valley*, does not provide otherwise. There, the Ninth Circuit acknowledged that on a motion for a preliminary injunction, "[t]he opposing party must be afforded the opportunity to cross-examine the moving party's

witnesses and to present evidence." *Gila Valley Irr. Dist.*, 31 F.3d at 1442 (citation omitted). The court then clarified, however, that the Ninth Circuit "has held that a preliminary injunction may be granted or denied on the basis of affidavits" if the party is not "denied the opportunity to be heard." *Gila Valley Irr. Dist.*, 31 F.3d at 1442.

¶45 The State's exchange with the District Court at the preliminary injunction hearing confirms that the State had a full opportunity to be heard. During the hearing, the District Court asked the State twice if its refusal to hear live testimony prevented the State from presenting any specific information or live witnesses. First, the State answered that its objection was grounded in "[n]one other than the inherent limitation of out-of-court testimony." The District Court then asked, "But there wasn't a witness that you weren't able to get an affidavit from that you would have been able to achieve live testimony with?" The State admitted it was "[n]ot . . . aware of" any witnesses from whom it was unable to get an affidavit. This colloquy shows that the District Court's limitation on oral testimony did not prevent the State from having a "full opportunity to submit written testimony and to argue the matter." *Stanley*, 13 F.3d at 1326 (citations omitted).

¶46 A district court has broad discretion in matters of trial administration and the admission of evidence. *State v. Rossbach*, 2022 MT 2, ¶ 20, 407 Mont. 55, 501 P.3d 914 (citation omitted) (trial administration decisions are reviewed under abuse of discretion standard); *Steer, Inc. v. Dep't of Revenue*, 245 Mont. 470, 475, 803 P.2d 601, 603-04 (1990) (citation omitted) (discretionary trial court rulings are those "encompassing the power of choice among several courses of action, each of which is considered permissible"). The District Court acted within its discretion when it determined that the presentation of live

26

testimony—which in this case involves extensive expert testimony and fact witnesses—should await trial on the merits. The court did not err as a matter of law in its conduct of the hearing. It ruled within the bounds of reason that Plaintiffs had shown a likelihood of success on the merits of their privacy claim.

**Irreparable Harm**

¶47 An applicant for a preliminary injunction must demonstrate that the applicant is likely to suffer irreparable harm in the absence of preliminary relief. Section 27-19-201(1)(b), MCA. Both this Court and federal courts have recognized that harm is irreparable if legal remedies, like an award for damages, are an inadequate remedy. *Flying T Ranch, LLC v. Catlin Ranch, LP*, 2022 MT 162, ¶ 19, 409 Mont. 478, 515 P.3d 806 (citation omitted) ("[m]oney damages are not considered irreparable harm"); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 677 (9th Cir. 2021) (citation omitted); *Life Spine, Inc. v. Aegis Spine, Inc.*, 8 F.4th 531, 545 (7th Cir. 2021) (citation omitted); *Together Emps. v. Mass Gen. Brigham Inc.*, 32 F.4th 82, 85 (1st Cir. 2022) (citation omitted) (noting that "adequate legal remedies foreclose injunctive relief"). Conversely, economic harm alone generally is not considered irreparable. *Netzer Law Off., P.C. v. State*, 2022 MT 234, ¶ 18, 410 Mont. 513, 420 P.3d 335 (affirming district court's conclusion that minimal economic harm is insufficient to justify preliminary injunctive relief); *E. Bay Sanctuary Covenant*, 993 F.3d at 677; *Transcon. Gas Pipe Line Co.*, 910 F.3d at 1165 (citation omitted) ("economic harm will not satisfy the irreparable-harm element in many cases"); *Heideman v. S. Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003) (citation omitted). A

27

showing of irreparable injury must be likely; speculative injury is insufficient. *MAID*, ¶ 15 (citing *Winter*, 555 U.S. at 22).

¶48    When a plaintiff's claim is grounded in the right to privacy, we have "recognized harm from constitutional infringement as adequate to justify a preliminary injunction." *Weems I*, ¶ 25 (citations omitted). "When an alleged deprivation of a constitutional right is involved, such as the right to free speech or freedom of religion, most courts hold that no further showing of irreparable injury is necessary." Wright & Miller, § 2948.1; *see also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981) (citation omitted) (irreparable injury is established when constitutional right of privacy is threatened or being impaired); *Melendres v. Arpaio*, 695 F.3d 990, 1000 (9th Cir. 2012) (quoting *Elrod v. Burns*, 427 U.S. 347, 373, 96 S. Ct. 2673, 2690 (1976)). ("It is well established that the deprivation of constitutional rights 'unquestionably constitutes irreparable injury.'").

¶49    Concluding that Plaintiffs had sufficiently demonstrated that SB 99 infringed on their fundamental right to privacy, the District Court found that they had established the irreparable injury factor. Plaintiffs' declarations further convinced the District Court that SB 99's prohibitions would likely lead to increased depression, anxiety, suicidal ideation, and suicide attempts for Provider Plaintiffs' patients. Youth Plaintiff Phoebe Cross's declaration also attested that taking away his gender-affirming care would leave him "fearful for [his] life."

¶50    The State argues that the District Court erred in finding for Plaintiffs on the likelihood of irreparable harm factor. Relying on its evidence that the treatments

28

proscribed by SB 99 cause "grievous physical, psychological, and emotional injury," the State asserts that the Plaintiffs' evidence is "subject to significant legitimate criticism that seriously undermines its reliability and scientific validity." The State implicitly asks the Court to reweigh the parties' evidence, asserting that "there is a substantial amount of evidence from all over the world that gender transition procedures do not, in fact, alleviate gender dysphoria, but instead lead to exacerbated mental health problems and even more significant distress." With an appeal of a preliminary injunction, however, we do not "determine the underlying merits of the case" and will not "reweigh conflicting evidence or substitute [our] judgment regarding the strength of the evidence for that of the district court." *Planned Parenthood*, 2022 MT 157, ¶¶ 5, 41 (citation and quotation marks omitted).

¶51 Plaintiffs' alleged injury—loss of the constitutional privacy right—is irreparable with a monetary remedy, which makes their claim appropriate for a preliminary injunction. *See Flying T Ranch, LLC*, ¶ 19; *Weems I*, ¶ 25; *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d at 677. Given the Plaintiffs' evidence that the most lasting and permanent forms of gender-affirming care are rarely performed on minors; that, without an injunction, minor patients would suffer severe psychological distress; and that SB 99 infringed on their fundamental right to privacy, Plaintiffs demonstrated a likelihood of irreparable harm. It was not a manifest abuse of discretion for the District Court to conclude that the Plaintiffs made an adequate preliminary showing of harm to warrant the preservation of their rights in status quo pending a full trial.

¶52    The State takes issue with the District Court's reference to preserving the status quo, contending that this is no longer part of Montana's preliminary injunction standard. *See Driscoll*, ¶ 26.  This is incorrect.  The United States Supreme Court recently reaffirmed that the purpose of a preliminary injunction is "to preserve the relative positions of the parties until a trial on the merits can be held." *Starbucks Corp. v. McKinney*, 600 U.S. 339, 346, 144 S. Ct. 1570, 1576 (2024) (quoting *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395, 101 S. Ct. 1830, 1834 (1981)); *see* § 27-19-201(4), MCA (expressing intent that "interpretation and application" of the new standard "closely follow United States [S]upreme [C]ourt case law").  Consistent with this standard, we long have recognized that "[d]uring a show cause hearing on a preliminary injunction, the district court should restrict itself to determining whether the applicant has made a sufficient case to warrant preserving a right in status quo until a trial on the merits can be had." *Knudson v. McDunn*, 271 Mont. 61, 65, 894 P.2d 295, 298 (1995) (citing *Porter v. K & S P'ship*, 192 Mont. 175, 181, 627 P.2d 836, 839 (1981)).  The District Court did not err when it relied on preservation of the status quo in its preliminary injunction order.

**Balance of the Equities and the Public Interest**

¶53    The third preliminary injunction factor asks whether "the balance of the equities tips in the applicant's favor."  Section 27-19-201(1)(c), MCA.  The final factor requires the applicant to establish that "the order is in the public interest."  Section 27-19-201(1)(d), MCA.  The public interest factor "is another way of inquiring whether there are policy considerations that bear on whether" to grant an injunction.  Wright & Miller, § 2948.4.  "When the government opposes a preliminary injunction, these two factors 'merge into one

30

inquiry.'" *Planned Parenthood of Mont. v. State*, 2024 MT 227, ¶ 34, 418 Mont. 226, 557 P.3d 471 (quoting *Porretti*, 11 F.4th at 1047); *accord Nken v. Holder*, 556 U.S. 418, 435, 129 S. Ct. 1749, 1762 (2009).

¶54 Enjoining SB 99, the State argued, would cause it irreparable injury that outweighed Plaintiffs' injury absent an injunction. The District Court determined conversely that the risk of adverse effects to Youth Plaintiffs' health, "including increased risk of suicidality," outweighed the harms to the State. The District Court also reasoned that preliminarily enjoining SB 99 served the public interest because "[i]t is always in the public interest to prevent the violation of a party's constitutional rights." *See Planned Parenthood*, 2024 MT 227, ¶ 36 (quoting *Melendres*, 695 F.3d at 1002); *Index Newspapers LLC v. U.S. Marshals Serv.*, 977 F.3d 817, 838 (9th Cir. 2020) (citation omitted); *Dodds v. U.S. Dep't of Educ.*, 845 F.3d 217, 222 (6th Cir. 2016) (citation omitted); *Pryor v. School Dist. No. 1*, 99 F.4th 1243, 1254 (10th Cir. 2024) (citation omitted). Plaintiffs' evidence indicated that other non-party minors with gender dysphoria would be harmed if SB 99 were not enjoined, which further convinced the District Court that the public interest would be served by preliminarily enjoining SB 99.

¶55 The statute at issue here prevents a wide range of treatment even when such treatment is determined, in the judgment of a medical professional working with their patients, to be in the patients' best interest and given with informed consent. The evidence showed that the proscribed medical interventions are not used for youth prior to the onset of puberty, and the most invasive (surgical) treatments are not recommended for patients before they turn eighteen. On the strength of the potential harm to those patients the statute

31

targets, the District Court reasonably concluded that the balance of the equities tips toward preliminary relief pending full consideration of the merits. Its analysis of the last two preliminary injunction factors was not arbitrary or unreasonable. The court did not manifestly abuse its discretion, and its injunction was not overbroad.

¶56 Finally, both parties have submitted notices of supplemental authority, citing recent cases considering challenges to various laws regarding gender-affirming care. Without exception, the additional authority pertains to claims grounded in the equal protection clause or otherwise based on alleged unlawful discrimination. Some of the authorities also reference new developments in research and evidence that was not part of the record presented to the District Court in the preliminary injunction proceedings. Because, on the record here, the District Court's conclusions on Montana's express privacy protections are sufficient to uphold its preliminary injunction, we affirm on that basis. The parties will have the opportunity during the merits proceeding for full development of the record, where their experts may offer insight on any new research, and for briefing on the current case law relative to their claims.

## CONCLUSION

¶57 The District Court made no error of law and did not manifestly abuse its discretion. We affirm its grant of a preliminary injunction on the basis of Plaintiffs' right to privacy claim. The case will proceed to trial, at which point the District Court will finally resolve the disputed facts and issue a final determination on the constitutional issues presented.

/S/ BETH BAKER

32

We Concur:

/S/ MIKE McGRATH
/S/ LAURIE McKINNON
/S/ INGRID GUSTAFSON
/S/ DIRK M. SANDEFUR
/S/ JAMES JEREMIAH SHEA

Justice Laurie McKinnon, concurring.

¶58    I concur in the Court's decision to uphold the preliminary injunction on Plaintiffs' right to privacy claim.  I write separately because I believe Plaintiffs' equal protection claim should likewise be addressed by the Court.

¶59    This Court's review of a preliminary injunction is a deferential question that asks whether the district court manifestly abused its discretion.  *Stensvad v. Newman Ayers Ranch, Inc.*, 2024 MT 246, ¶ 8, 418 Mont. 378, __ P.3d __.  This limited review for purposes of injunctive relief makes sense: the parties have minimal opportunity to develop the record; the district court judge must work quickly and from a narrow set of facts; this Court can only review the limited information before it.  There is much left to be litigated on the merits in this case, especially considering the thorny social, scientific, and legal landscape from which it arises, and courts should have the benefit of a more complete record before making ultimate decisions on the merits.  *See Stensvad*, ¶ 27 (explaining how this Court's preliminary injunction test seeks to preserve intensive merits litigation for the post-injunctive relief stage).  But there is a line between deciding narrowly for the purposes of an appeal of a preliminary injunction and refusing to decide the issue which is front and center to the controversy.  By entirely ignoring the parties'

33

equal protection arguments, this Court crosses that line, leaving the parties and the District Court without necessary guidance on questions of law entirely appropriate for this Court to address at this juncture. This Court's avoidance of a claim squarely before us puts the parties at a disadvantage going forward on the merits case.

¶60 Aside from the question of standing, the vast majority of the parties' arguments and the District Court's Order focuses on the unique equal protection issues presented by this case—novel legal issues on which the parties and the District Court require this Court's instruction before trial proceeds. While a prohibition on gender-affirming care must be evaluated under Montana's right to privacy precedent, the prohibition on gender-affirming care is fundamentally about the nature of sex and suspect class discrimination as it applies in the equal protection context. Gender-affirming care is currently being litigated on equal protection grounds around the country, and the United States Supreme Court is poised to take up the issue this term, *see L.W. v. Skrmetti*, 73 F.4th 408 (6th Cir. 2023), *cert. granted sub nom. United States v. Skrmetti*, 144 S. Ct. 2679 (2024). These cases are instructive in certain ways, but they cannot answer what this Court is being asked: how sex/gender discrimination and suspect class discrimination should be handled under the unique equal protection provision of the *Montana* Constitution. In fact, Plaintiffs' complaint is made up of claims *exclusively* under the Montana Constitution. No other Court can answer these questions. The Montana Constitution stands on its own, as does Plaintiffs' equal protection challenge.[1]

---

[1] We have held repeatedly that the Montana Constitution provides greater protection under its equal protection provision. *Snetsinger v. Mont. Univ. Sys.*, 2004 MT 390, ¶ 15, 325 Mont. 148,

34

¶61     The District Court's Order points out a critical gap in our equal protection jurisprudence, specifically, that this Court "has not yet explicitly identified the level of scrutiny applicable to classifications that are sex-based, nor has it explicitly stated that sex is a suspect class." At the federal level, defining the classes for equal protection purposes is driving a prudential rift, because that class definition determines what standard of scrutiny is applied under the U.S. Constitution. Many competing theories pervade. For example, in *Skrmetti*, the Sixth Circuit found that the law did not discriminate on sex because it banned gender-affirming care for minors of both sexes. *Skrmetti*, 73 F.4th at 419-20. The Eleventh Circuit has held that legislation blocking gender-affirming care "targets specific medical interventions for minors" and does not classify "on the basis of any suspect characteristic under the Equal Protection Clause." *Eknes-Tucker v. Governor of Alabama*, 80 F.4th 1205, 1227 (11th Cir. 2023). Appellants argue similarly. Of course, the question in *Skrmetti* will be analyzed and decided under the federal constitution and precedent—not Montana's Constitution and precedent.

¶62     Montana's constitutional equal protection provision and this Court's precedent stands apart and in addition to the minimum safeguards provided by our federal counterpart. They provide clear direction as to the appropriate tier of scrutiny. When legislation infringes on fundamental rights, including within the equal protection framework, it receives strict scrutiny because the interest discriminated against *is* a

104 P.3d 445. Thus, we need not and should not lock-step with the U.S. Constitution's interpretation of similar language. *See State v. Covington*, 2012 MT 31, ¶¶ 20-21, 364 Mont. 118, 272 P.3d 43 (explaining that this Court "will undertake a unique, state constitutional analysis" when there is support for greater protection under the state constitution).

fundamental right.  *See Planned Parenthood v. State*, 2024 MT 178, ¶ 29, 417 Mont. 457, 554 P.3d 153; *Snetsinger*, ¶ 17 ("Strict scrutiny applies if a suspect class or fundamental right is affected.").  At least two fundamental rights are implicated here: the right to be free from discrimination based on sex which necessarily includes transgender status as explained below, and the right to privacy already addressed by the Court.[2]  Strict scrutiny is undoubtedly the appropriate tier of scrutiny.

¶63    As the District Court noted, transgender discrimination is, by nature, sex discrimination.  This logic is supported in part by *Bostock v. Clayton County*, 590 U.S. 644, 140 S. Ct. 1731 (2020), where the Supreme Court held that discrimination based on transgender status is sex discrimination.  In the gender-affirming care case currently pending before the Supreme Court, however, Tennessee advances the Sixth Circuit's reasoning that *Bostock*'s holding is limited to the Title VII context, receiving a lower standard of scrutiny in other contexts.  Appellants argue similarly before this Court.  But again, the Montana Constitution's equal protection provision offers a critical distinction—like Title VII, it explicitly prohibits discrimination on the basis of sex.  Thus, even if the Supreme Court limits *Bostock*'s recognition of transgender status-based sex discrimination to the Title VII context, the Montana Constitution is not limited in the same way.  *Bostock*'s logic is sound: "[I]t is impossible to discriminate against a person for being . . . transgender without discriminating against that individual based on sex."

---

[2] One might also posit that the right to equal protection of the laws is itself a fundamental right warranting strict scrutiny based on its presence in the Declaration of Rights, regardless of the classifications being challenged.  Nevertheless, this Court has developed a three-tier framework for the appropriate standard of scrutiny in an equal protection challenge.  *See Snetsinger*, ¶ 17.

*Bostock*, 590 U.S. at 660, 140 S. Ct. at 1741. By declining to engage with this question now, we leave this critical definition open to lock-stepping by complicity in whatever direction the United States Supreme Court decides to take. This Court should take the opportunity to clearly state that discrimination based on sex as explicitly contained in the equal protection clause includes discrimination on the basis of transgender status.

¶64 I would therefore affirm the District Court's finding that SB 99 discriminates based on sex and that strict scrutiny is the appropriate standard of review; not because it is more analogous to the federal "heightened scrutiny" standard for sex discrimination as the District Court reasoned, but because Article II, Section 4 is unequivocal in its intolerance for discrimination, which includes discrimination based on sex. Article II, Section 4 "provides even more individual protection" than its federal counterpart, *Snetsinger*, ¶ 15, so we need not parse federal gender discrimination law in search of an analogous level of scrutiny.

¶65 Moreover, this Court should separately and additionally hold that transgender status is a suspect class. Plaintiffs' District Court briefing makes a compelling case as to why transgender status is a suspect class that also triggers strict scrutiny. The District Court noted its belief "that transgender persons comprise a suspect class" based on the federal definition. *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 28, 93 S. Ct. 1278, 1294 (1973) (defining a suspect class as one "saddled with such disabilities, or subjected to such a history of purposeful unequal treatment, or relegated to such a position of political powerlessness as to command extraordinary protection from the majoritarian political process"). But given this Court's lack of precedent on defining a

37

suspect class under the Montana Constitution, the District Court "decline[d] to fully engage in this analysis." This Court has been explicitly asked to clarify this question on appeal, yet declines to do so without explanation. Like the District Court, I would agree that transgender persons comprise a suspect class.

¶66 Thus, critically, strict scrutiny is the appropriate level of scrutiny on at least three separate bases. I would conclude the District Court did not manifestly abuse its discretion in granting the preliminary injunction because Plaintiffs are likely to succeed on the merits on both their equal protection and right to privacy claims because SB 99 cannot survive strict scrutiny; Plaintiffs will face irreparable harm if SB 99 is allowed to go into effect; and the balance of equities and public interest favors granting the injunction.

¶67 The parties briefed the equal protection issue extensively and will proceed to trial on the merits of their equal protection claim. We do the District Court and the litigants a disservice when we avoid articulating the simple rule that discrimination on the basis of transgender status is sex discrimination, sex discrimination receives strict scrutiny, and that transgender persons comprise a suspect class also triggering strict scrutiny. Ignoring the most substantive legal arguments of the case is not an act of judicial restraint or deciding the case narrowly. It is an unjustifiable avoidance of a cornerstone question which, if unanswered, will create further litigation; waste resources and time; and create needless expense as the trial proceeds on the merits. More importantly, our avoidance will delay resolution of this issue for those most affected by our decision—transgender persons seeking medical care in time-sensitive scenarios. We ought to resolve this claim that has been correctly and aptly raised before this Court.

38

/S/ LAURIE McKINNON

Justice Ingrid Gustafson joins the Concurrence of Justice Laurie McKinnon.

/S/ INGRID GUSTAFSON

Justice Jim Rice, concurring in part and dissenting in part.

¶68    I concur with the Court's holding affirming the District Court's entry of a preliminary injunction enjoining SB 99's medical restrictions. A legislative prohibition of an approved medical procedure must satisfy the high bar of being narrowly tailored to serve a compelling state interest in addressing a bona fide health risk. Further, the status quo is that the treatments now restricted by SB 99 have been, and are, ongoing. Thus, under application of these standards, I concur with the Court that the District Court did not manifestly abuse its discretion in determining that Plaintiffs had satisfied the conjunctive factors for issuance of the preliminary injunction regarding SB 99's medical restrictions to preserve the status quo pending trial in the proceeding.

¶69    However, it should also be noted that both the medical and legal grounds regarding the subject treatment of minors addressed by SB 99 are moving under our feet, and the status quo itself is becoming a moving target, even as this litigation continues. As the Court notes, Opinion, ¶ 35, the FDA has not approved puberty blockers for use in treating gender dysphoria. The State has filed several notices of supplemental authority providing further national and international decisions recognizing growing concerns over the medical benefit of this treatment and the legitimate basis for state intervention. *See TransActual*

39

*CIC v. Sec'y of State for Health and Soc. Care*, [2024] EWHC 1936, ¶¶ 194-95 (England High Court of Justice) (citing a study described as the "best and most-up-to-date scientific evidence available" which concludes "any benefits of puberty blockers were (save in one 'very narrow' respect) unproven or non-existent."); and *Alabama v. United States Sec'y of Educ.*, No. 24-12444, 2024 U.S. App. LEXIS 21358, at *3-4 (11th Cir. Aug. 22, 2024) (noting that "every court to consider the issue across the nation—seven district courts and two courts of appeals—preliminarily enjoined enforcement" of a new Title IX rule, 89 Fed. Reg. 37,522 (May 6, 2024), which would have required healthcare providers and states to perform and pay for gender-transition procedures). Other states have likewise restricted gender-affirming care. *See L.W. v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023) (reversing preliminary injunction entered against state bans on gender-affirming care enacted in Tennessee and Kentucky because a likelihood of success on the merits of substantive due process and equal protection claims not demonstrated). This small sampling is enough to highlight both the changing legal landscape and the gravity of the governing principle that neither this decision from our Court nor the District Court's decision should affect in any way the ultimate outcome, which must be based on advancing medical science and law in regard to a serious concern over minors receiving this treatment.

¶70    I would reverse the District Court's enjoinder of the funding prohibition of SB 99, *see* 2023 Mont. Laws ch. 306, § 8, which was codified as § 53-6-135, MCA, particularly in light of the broad enjoinder of the new Title IX rule by the federal courts. As such, there is no current federal mandate for Medicaid funding of gender-affirming care. *See Texas v. Becerra*, No. 6:24-cv-211-JDK, ___ F. Supp. 3d ___, 2024 U.S. Dist. LEXIS 117573, (E.D.

Tex. July 3, 2024). Further, funding decisions fall within the Legislature's primary constitutional duty and responsibility over spending decisions, and I believe they should be subject to rational basis review. *See Timm v. Mont. Dep't. of Pub. Health & Hum. Servs.*, 2008 MT 126, ¶ 34, 343 Mont. 11, 184 P.3d 994 ("[T]here is no fundamental right to receive Medicaid benefits in Montana."); *Harris v. McRae*, 448 U.S. 297, 317-18, 100 S. Ct. 2671, 2688-89 (1980) ("[F]reedom of choice in the context of certain personal decisions [] does not confer an entitlement to such funds as may be necessary . . . .").

¶71    I concur and dissent.


/S/ JIM RICE